THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ROBERT VAN BRUNT, Appellant.

*Court of Appeals, February* 28, 1888.

Affirming same case,11 N. Y. St. Rep. 59.

1. *Criminal law. Appeal.*—Where an appeal to the Supreme Court was taken before the amendment of 1887 to section 528 of the Code of Criminal Procedure, but the appeal to the court of appeals, after its enactment, the latter court will construe the terms of the amendment distributively, and will not deny to the prisoner the review upon the facts, which he seeks, by any nice or critical construction of the amendment.

2. *Same. Deliberation.*—The facts and circumstances of this case were held sufficient by the court of appeals to establish reflection and deliberation in the commission of the homicide.

Appeal from a judgment of the general term of the supreme court, affirming a judgment upon conviction of the defendant, at the oyer and terminer, of the crime of murder in the first degree.

*L. W. Thayer*, for appellant.

*E. M. Bartlett*, for respondents.

FINCH, J.—The defense of the prisoner was confined solely to the degree of his crime. The killing was conceded, and no attempt was made to justify or excuse it, but the whole contest at the trial turned upon the inquiry whether the act was deliberate or a sudden and unreflect-

ing outbreak of passion. Evidence was given tending to show that the defendant was subject to severe headaches, and fits resembling the known effects of epilepsy, and that he had made one or two attempts at suicide, but no claim or defense of insanity was interposed. These circumstances were relied on to make more probable the prisoner's testimony that he fired the shot which took the life of William Roy without forethought and upon an instantaneous impulse. The jury, however, were so satisfied that the act was characterized by some degree of deliberation as to have disbelieved his statement to the contrary; and they rendered a verdict of murder in the first degree which the general term have affirmed.

The prisoner asks us to review the facts under the law of 1887, amending section 528 of the Code of Criminal Procedure, and to determine upon such review whether the verdict shall stand. The prosecutor insists that the amendment, by its terms, has no application to this appeal, and relies upon its provisions that " the amendments herein shall not affect any appeal taken to or pending in the supreme court or court of appeals at the time this act shall become a law." The appeal to the supreme court was taken before the amendment, but that to this court after its enactment. It is possible to construe the terms of the amendment distributively, and we think we ought to do so and not deny to the prisoner the review upon the facts which he seeks by any nice or critical construction of the amendment. Nevertheless, after having read carefully the whole of the evidence given upon the trial, we have reached the same conclusion upon the question of deliberation which prevailed with the jury.

The prisoner's jealousy of the deceased was no new or sudden emotion. It had for weeks occupied his thoughts and filled him with hatred for the half-brother whose death he finally effected. It had broken his sleep and made him unhappy and miserable according to his own account. His

imagined injury took two forms. He believed that the deceased was using his influence as a brother to induce his sister, to whom the prisoner was engaged, to break that engagement and retreat from the promised marriage, and was continually preventing by his presence the personal interviews which the defendant sought with Eva. The other and more remarkable suspicion was that Roy was pursuing his half-sister as a lover and with her knowledge, for he says that she admitted to him that she had become satisfied that such was the fact. She was recalled by the prosecution after the prisoner had testified in his own behalf, and denying the truth of some of his statements, was silent as to this. The anger and resentment thus born and fostered evidently gained the mastery of a suspicious and unbalanced mind. It produced, as we are told by his own declarations to others, a warning given by him to the deceased that his interference was dangerous, and led, not unnaturally to the events of the fatal night. Using a pistol, threatening to shoot an intruder upon his courtship, were things not unfamiliar to his thoughts, for Eva testified to such a threat against her own father, and another against a chance visitor.

On the night of the murder the prisoner had gone upstairs to his room, while Eva and Will had passed into the sitting-room. He had acquired the bad and evil habit of carrying about with him, at least in the evenings, a loaded pistol. He had produced it when he asked Eva to marry him and indulged in some wild talk that they would have to live together or die together, and that he would shoot her if she did not consent to marry him.

Evidently here was a man, perhaps not wholly meaning all that he said, but quite too fond of thinking and talking about shooting, and liable to underrate the enormity of the offense. His habit was to leave his revolver in the daytime on the secretary or in the pocket of his overcoat hanging in his room, but to put it in his hip-pocket as a rule,

when he went out at night. He says he did so on that night, but when he came in and undressed for bed it would be quite natural for him to take out the pistol and put it one side as no longer needed to avoid the danger of dropping it from his pocket or exploding it by careless or thoughtless handling of his clothing.

He declares that when he reached his room he undressed and went to bed and fell asleep. As his custom was to leave his revolver in his room through the day, it would naturally be also his custom to take it out of his hip pocket and lay it aside as he prepared for bed. Fred Roy, who was his room-mate and slept with him, says that was his habit. He further testifies that the prisoner did not come to bed, but he depends partly upon inference, and may be mistaken. The prisoner says he was awakened, and heard whispering downstairs, and, without knowing who it was, got up and put on his socks and pantaloons and began an endeavor to ascertain what was going on. He listened first at a stovepipe hole, and, unable to hear, stole silently in his stocking feet down the stairs. Eva saw him and describes him as peeking from the foot of the stairs. He tells us that he knocked down something which made a noise, and since they would know from the sound that some one was coming he went back to his room. Eva heard him go back to his room after she had seen him looking at them from the stairway. His suspicions had been verified. The persons he saw were Eva and her half-brother, and she sitting near him in her night dress. He did not know that she had innocently put it on over her ordinary clothing, and to his jealous suspicions and hot temper we can imagine the effect of the discovery. Why did he go back to his room? If "fired with jealousy," as he says, and acting from impulse and without reflection, why did he not burst out upon them at the first view of what seemed to him the situation? The inference that he went back to get his revolver appears to us very strong. In describing the events of the night to

the witness Davis he said " he mistrusted it was young Roy talking with Eva and he took his revolver in his hand and started downstairs." Eva describes him as peeking out at them twice before he made his appearance. After having gone back to his room he came down again and walked into the sitting-room and stopped in front of the pair. He describes what he saw or believed that he saw. There was the girl who had promised to be his wife sitting by the sewing machine in her night dress, and her half-brother, suspected of being her lover, sitting near with his arm about her shoulders.

To the jealous and angry temper of the prisoner the sight was calculated to evoke a burst of passion, unless controlled by reflection and restrained for the accomplishment of a further purpose. The passionate outbreak did not come. Where he stood, the eyes of Eva and Will were upon him. The latter was strong and athletic and not likely to be shot down without resistance if he saw the weapon in advance. Standing there the prisoner utters only this remonstrance : " Eva, I thought your ma wanted you to go to bed some time ago; now you are sitting up here at this time in the morning." Eva answered that her mother had allowed her to come out and talk with Will because he was going on the midnight train. In this quiet and almost timid remonstrance there is no trace of sudden passion, unless covered and concealed for an ulterior purpose. He spoke to the girl after having simply expressed his surprise to the man that he had not gone on the midnight train. Then he passes around Will in a half-circle and takes a position which brings him no longer in front of, but at the side of each; a position behind the sewing machine and a stand near it, in which a pistol could be drawn and aimed with a safety from observation and interference, which while standing in front could not be obtained. Eva asks Will where he is going. He replies, lean over and I will tell you. As their heads approach and their attention is diverted, the prisoner sees

his opportunity, and reaching his revolver across the sewing machine and quite near to his victim's head, shoots him through the temple. Describing the scene afterwards, he says " I shot to kill." The remarkable thing about his assertion of a sudden impulse prompting to the murderous act is this : that when such impulse would have been natural and might have been expected, it did not come ; and when the moment for such impulse had passed and no new event sufficient to provoke it had occurred, it made its tardy appearance. His change of position, as the general term suggests, was quite significant. He was asked to explain it, and give his reason for the movement, but answered only that he did not know. Not only in these facts was there time in abundance for reflection and deliberation, but from the moment that he took his pistol and stepped softly and tried to step silently down the stairs, it seems possible to trace the purpose and plan which unfolded itself in his movements and ended in the murder.

Taking all the facts together and making every allowance for the peculiar mental organization of the prisoner, we are yet constrained to say that the jury did not err in their verdict.

The judgment should be affirmed.

All concur.